## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| M.C., | Civ. No. 21-19819 (RK)(JBD) |
| Plaintiff, | REPORT AND RECOMMENDATION |
| v. | |
| STEVAN HARNAD, *et al.*, | |
| Defendants. | |

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(b)(1), and Local Civil Rule 72.1(a)(2).

Plaintiff M.C. moves for leave to file a second amended complaint after the Court dismissed her claims against defendant Trustees of Princeton University d/b/a Princeton University. [Dkts. 62, 74.] In a substantially similar case brought by M.C.'s sister, *N.S. v. Harnad*, Civ. No. 21-19820 (RK)(JBD), the plaintiff filed an analogous motion for leave to file a second amended complaint, *id.* at [Dkt. 52], and the undersigned recently issued a Report and Recommendation (the "*N.S.* R&R") recommending that that motion be denied as futile and that the case against Princeton be closed with prejudice, *id.* at [Dkt. 62]. The Honorable Robert Kirsch, U.S.D.J., subsequently adopted the *N.S.* R&R in its entirety. *See N.S. v. Harnad,* Civ. No. 21-19820 (RK), 2025 WL 600929 (D.N.J. Feb. 25, 2025). To the extent applicable, the undersigned incorporates the *N.S.* R&R here.

Upon a close review, the undersigned identifies a few differences between the proposed pleadings in *N.S.* and M.C.'s proposed second amended complaint here.

The undersigned addresses those differences below.  The upshot, however, is that they do not change the outcome.  For the reasons set forth in the *N.S.* R&R and as supplemented below, the undersigned recommends that M.C.'s motion for leave to file a second amended complaint be denied because the proposed amendments do not cure the deficiencies that the Court identified in the first amended complaint, and because the proposed second amended complaint would not survive a renewed motion to dismiss.  The undersigned further recommends that M.C.'s case against Princeton be closed with prejudice.

## I.    BACKGROUND

M.C. filed her initial complaint in the Superior Court of New Jersey, Mercer County on October 26, 2021 against defendants Princeton,[1] Steven Harnad, and several ABC entities, John Does, and Jane Does.  *See* [Dkt. 1], Ex. B.  M.C. filed a corrected complaint naming the same defendants on November 2, 2021.  *Id.*, Ex. A.  In her complaint, M.C. alleged seven counts against defendants.  *Id.*, Ex. A at 2-13.  The claims stemmed from M.C.'s allegation that from 1970 to 1972, as a minor and resident of Princeton, New Jersey, she was groomed on Princeton's campus—

---

[1]    M.C.'s initial complaint improperly pled both "Princeton University" and "The Trustees of Princeton University" as defendants, but she later attempted to correct the caption at the Court's direction to name only "The Trustees of Princeton University."  *See* [Dkts. 24, 25].  However, due to a clerical error, the case caption change was never processed.  This issue is the subject of M.C.'s Motion to Update and Correct Case Caption for All Court Records and Reinstate Defendant "The Trustees of Princeton University."  [Dkt. 68.]  In light of the undersigned's recommendation, that motion is denied as moot.  For the sake of clarity, however, the undersigned refers to the Trustees herein as "Princeton."

2

and subsequently sexually assaulted off campus—by defendant Harnad, who M.C. alleged was both a Princeton student and employee at that time. *Id.*

Princeton removed the case to this Court on November 8, 2021, and filed a motion to dismiss the complaint on January 6, 2022. [Dkts. 1, 9.] On February 17, 2023, the Court granted the motion to dismiss as to Princeton on the grounds that M.C. failed to meet the pleading standard under Federal Rule of Civil Procedure 8(a)(2), which requires giving defendants "fair notice" as to the substance of the claims against them. [Dkt. 22] at 4-8. The Court dismissed the case without prejudice and granted M.C. leave to amend her complaint. [Dkt. 23.]

On April 14, 2023, M.C. filed her first amended complaint ("FAC") naming Harnad, Princeton, and multiple John Does, James Roes, and ABC entities as defendants. [Dkt. 27.] The FAC alleged five counts against defendants: (i) crimes of a sexual nature, sexual abuse, and sexual assault pursuant to the New Jersey Child Victims Act (N.J.S.A. 2A:14-2b) and the Child Sexual Abuse Act (N.J.S.A. 2A:61B-1) against defendant Harnad (Count One); (ii) duty of a property owner to protect a licensee/social guest against foreseeable risks of harm against defendant Princeton (Count Two); (iii) property owner's/business's/contractor's duty to protect invitees/social guests against criminal activity, including crimes of a sexual nature, sexual abuse, and/or sexual assault, against Princeton and several John Does and ABC entities (Count Three); (iv) duty of a school, university, business, and/or supervisor to properly supervise and oversee employees, agents, or volunteers against Princeton and multiple James Roes (Count Four); and

3

(v) intentional and negligent infliction of emotional distress against defendants Harnad and Princeton (Count Five).  [Dkt. 27] at 8-19.  Princeton moved to dismiss Counts Two through Five of the FAC.  [Dkt. 32.]

On June 27, 2024, the Court issued an opinion and order dismissing without prejudice Counts Two through Five as to Princeton and granting M.C. leave to file an amended complaint by August 12, 2024.  [Dkts. 49, 50.]  After M.C. requested an extension to file a second amended complaint ("SAC"), however, the Court issued a text order granting the extension request, but requiring M.C. to file a motion for leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2).  [Dkts. 51, 52.] In so ruling, the Court noted "the age of the case and number of previous decisions," the fact that M.C.'s complaint had been dismissed twice, and that its previous order granted leave to amend "by August 12, 2024, to give M.C. a final chance to plead a valid claim" against Princeton.  [Dkt. 52.]

On September 12, 2024—one day before the extended deadline to file a motion for leave to amend—M.C.'s counsel filed a letter seeking to withdraw because M.C. terminated him for "irreconcilable differences."[2]  [Dkt. 53.]  The same day, M.C. requested an extension of time to file a motion for leave to amend in light of her attorney's request to withdraw.  [Dkt. 60].  The next day, M.C. filed a proposed SAC, and a few days later she filed a motion seeking leave to file a different amended pleading.  [Dkts. 61, 62.]  After the Court granted M.C. a series

---

[2]    The Court ultimately granted the request, [Dkt. 58], and M.C. has proceeded *pro se* since that time.

of extensions to obtain new counsel for the purpose of filing yet another proposed amended complaint, *see* [Dkts. 66, 72], M.C. filed a proposed corrected SAC on December 6, 2024.  [Dkt. 74.]  Pursuant to the Court's text order dated December 23, 2024, the undersigned reviews that corrected proposed SAC as the operative proposed pleading.  [Dkt. 76.]  In deciding the present motion, the undersigned has considered all relevant submissions, including M.C.'s earlier motion to amend and Princeton's opposition [Dkts. 62, 63]; M.C.'s reply brief [Dkt. 73]; Princeton's supplemental submission in opposition to the proposed corrected SAC [Dkt. 77]; and M.C.'s supplemental letter to the Court dated January 21, 2025 in further support of the proposed SAC [Dkt. 78].

In seeking leave to file her proposed SAC, M.C. argues that "[t]he proposed amendments address the deficiencies identified by the Court [in its June 27, 2024 opinion] directly and specifically."  [Dkt. 62] at 3.  In particular, M.C. asserts that "[t]he key difference[s]" between the proposed SAC and the previously filed FAC are that she now "alleges gross negligence by Princeton [ ] in maintaining a dangerous campus environment and their gross omission of any protections for minors in the Open Campus Policy," "presents a claim based on the doctrine of *respondeat superior*," and "alleges sufficient facts to demonstrate that [Princeton] owed [M.C.] a duty of care" since "the egregious dangers were reasonably foreseeable given [Princeton]'s 'Open Campus' policy and their omissions of any care."  *Id.* at 3-4. M.C. further asserts that she has "uncovered new archival evidence indicating that [Princeton] knew or should have known about the dangers posed to minors, based

on foreseeable harm" and that "[t]hese new facts strengthen [her] original claims." *Id.* at 4; *see also* [Dkt. 74] at 2.

In opposition, Princeton argues that the Court should deny leave to amend because the proposed amendments would be futile, and that the case against it should be dismissed with prejudice.  [Dkts. 63, 77.]  Specifically, Princeton contends that the proposed SAC fails to state any plausible claims, does not address the identified deficiencies in M.C.'s prior pleadings, and "does little more than repackage the contents of the previously dismissed [FAC]."  [Dkt. 77] at 2; *see also* [Dkt. 63] at 9-12.

## II.    LEGAL STANDARDS

The undersigned adopts and incorporates the legal standards set forth in the *N.S.* R&R.  *See* Civ. No. 21-19820, [Dkt. 62] at 5-8.

## III.    DISCUSSION

M.C. asserts five counts in her proposed SAC, three of which she asserts against Princeton:  (1) *Respondeat Superior* (Count One); (2) Gross Negligence (Count Two); and (3) Negligent Infliction of Emotional Distress (Count Three). [Dkt. 74] ¶¶ 75-171.  Princeton opposes M.C.'s motion for leave to amend on futility grounds on all counts asserted against it.[3]  [Dkts. 63, 77.]  The undersigned addresses the sufficiency of each of M.C.'s proposed claims in turn.

---

[3]    Princeton also argues that the proposed amendments are futile because they are time-barred.  [Dkt. 63] at 8-9, [Dkt. 77] at 4.  Because this Report and Recommendation recommends that the motion to amend be denied on futility grounds and the case against Princeton be closed with prejudice, the undersigned does not address this additional argument.

### A.  *Respondeat Superior* (Count One)

Count One of the proposed SAC alleges for the first time a claim of *respondeat superior* against Princeton.  [Dkt. 74] ¶¶ 75-109.  As noted in the *N.S.* R&R, "the doctrine of *respondeat superior* does not provide an independent cause of action under New Jersey law."  *N.S.* R&R at 36 (quoting *Rowan v. City of Bayonne*, 474 F. App'x 875, 878, n.3 (3d Cir. 2012) (citation omitted)).  Thus, Count One fails on this ground alone, but for completeness, the undersigned will construe the assertion of *respondeat superior* liability against Princeton as a component of the other tort claims that M.C. asserts directly against Harnad in the proposed SAC.

Like N.S., M.C. asserts in her proposed SAC that Harnad was an agent of Princeton and held a position that allowed him to regularly interact with minors, including M.C., "only steps away from his office in the Psychology Department." [Dkt. 74] ¶¶ 25, 65, 73-74, 84, 92-93.  M.C. further alleges that because Harnad's "grooming tactics and other criminal maneuvers against [M.C.] occurred on [Princeton] property, during times when he was ostensibly fulfilling his role as agent," Princeton bears liability for his actions.  *Id.* ¶¶ 80-84, 90-99, 108-109. Indeed, M.C.'s proposed SAC alleges that Harnad's role at Princeton "*enabled* him to target and stalk [M.C.] on the premises of [Princeton] unrestrained and unencumbered *almost daily*" due to Princeton's "failure to implement adequate safeguards" or otherwise supervise or control Harnad's conduct, or the minors present on campus.  *Id.* ¶¶ 84-86, 94-99, 105-109 (emphasis in original).

In response, Princeton contends that the proposed SAC fails adequately to allege any employment or agency relationship between Harnad and Princeton, and that even if Harnad was Princeton's agent, "Harnad's alleged sexual assault of [M.C.] is undoubtedly 'beyond the scope' of any possible employment that he had with [Princeton]."  [Dkt. 77] at 4; *see also* [Dkt. 63] at 10-11.  As a result, Princeton argues that M.C. fails to state a claim for *respondeat superior*, and that amendment would be futile.  *Id.*; [Dkt. 63] at 10-11.  The undersigned agrees.

As an initial matter, while the FAC previously asserted that Harnad was an "agent" of Princeton working "as a student teacher, teaching assistant, graduate assistant, research assistant, and/or student volunteer," [Dkt. 27] at 13, the proposed SAC merely alleges, without specificity as to the type of relationship, that "Defendant Harnad was an agent of the principal, [Princeton]," and that Harnad "had full access to a private office as well as classrooms in the Psychology Department at Princeton," and regularly "mov[ed] in and out of buildings on and around" the Princeton campus.  [Dkt. 74] ¶¶ 25, 65, 73-74, 84, 92-93.  Even assuming, *arguendo*, that this is sufficient to plausibly allege an agency relationship between Harnad and Princeton, like N.S.'s proposed SAC, M.C.'s proposed SAC "alleges no facts permitting a plausible inference that interacting with, sexually grooming, and sexually assaulting non-student minors were actions 'of a kind [that Harnad was] employed to perform.'"  *N.S.* R&R at 38 (quoting *Brijall v. Harrah's Atlantic City*, 905 F. Supp. 2d 617, 622 (D.N.J. 2012)).

Accordingly, for the reasons detailed above and in the *N.S.* R&R at pages 36-39, the undersigned recommends that the motion to amend be denied with respect to Count One of the proposed SAC.

### B.    Gross Negligence (Count Two)

The Court emphasized in its previous opinion that M.C.'s premises liability claims, which require pleading gross negligence, "hinge[d] on whether it was reasonably foreseeable that Harnad was sexually assaulting [M.C.] and that [Princeton] failed to exercise even 'slight care or diligence' in the investigation, detection or prevention of Harnad's sexual molestation of [M.C.]." [Dkt. 49] at 9 (quoting *Doe ex rel. Doe v. Small*, 654 F. Supp. 3d 376, 396 (D.N.J. 2023) (quoting *Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742, 745 (2016)).  The Court ultimately concluded that the pleadings in the FAC were deficient.  *Id.* at 14.  In so holding, the Court noted that, "while [M.C.] argues that Harnad's grooming took place on Princeton's campus . . . the actual sexual assault occurred off premises." *Id.* at 13.

Here, Princeton argues that "while [M.C.] alleges in a conclusory manner that [Princeton] committed gross negligence by opening the campus to the public and creating a 'sexually hostile environment,' the [SAC] is—just like the last version of the complaint—devoid of actual, plausible factual allegations that suggest [Princeton] acted with grossly inappropriate care towards [M.C.] in the circumstances alleged."  [Dkt. 77] at 5.  Princeton asserts that M.C. makes only conclusory allegations that Princeton knew or should have known of past and

9

present sexual misconduct by Harnad, and still does not allege plausible facts indicating how or why Princeton knew or should have known of the sexual abuse committed by Harnad.  [Dkt. 63] at 12-15.  Thus, Princeton contends, the SAC continues to fail "to allege anything more than purported inattention or mistaken judgment," and not gross negligence.  *Id.* at 12.

M.C., on the other hand, argues that her proposed SAC addresses the deficiencies identified in the Court's June 27, 2024 opinion and asserts a claim of gross negligence as to Princeton because she plausibly alleges facts that demonstrate Princeton "owed [M.C.] a duty of care."  [Dkt. 62] at 3-4; *see also* [Dkt. 74] at 2.  The proposed SAC alleges that Princeton had a duty "to implement necessary security measures in [its] enactment of the Open Campus Policy to protect minors on campus, including [M.C.]," and that Princeton's "failure to foresee and address the obvious risks—despite the known presence of drugs, alcohol, and a sexually hostile environment," breached that duty.  [Dkt. 74] at ¶ 111; *see also* [Dkt. 78] at 1.  M.C. further asserts that Harnad groomed her on Princeton's campus in plain sight, and that Princeton knew or should have known "that allowing unsupervised minors to wander a hazardous, male-dominated campus could lead to serious harm," making M.C.'s sexual abuse at the hands of Harnad foreseeable to Princeton.  *Id.* at ¶ 120.  The undersigned incorporates the discussion of the legal landscape for gross negligence claims from the *N.S.* R&R in full and will not reproduce that discussion here.  *See N.S.* R&R at 8-12.  With those legal

10

standards in mind, the undersigned addresses the sufficiency of M.C.'s allegations below.

> **1.    The Risk of Harm to M.C. Was Not Foreseeable to Princeton Based on Acts Alleged to Have Occurred in Plain Sight.**

In the FAC, M.C. alleged that her grooming and sexual assault was foreseeable to Princeton because the university had constructive knowledge of her sexual abuse, as proctors "regularly observed [M.C.] in the presence of Harnad and his grooming of [M.C.]" on campus and asked "on more than one occasion what kind of relationship she had with [Harnad]." [Dkt. 27] at 6. The Court noted in its June 27, 2024 opinion that the FAC did not provide how or whether M.C. responded to those alleged inquiries, nor did M.C. allege anywhere that she or anyone else reported Harnad to anyone at Princeton for his sexually deviant behavior until the commencement of this lawsuit in October 2021. [Dkt. 49] at 9-10. This, without more, "d[id] not permit the Court to draw any inference—for or against—regarding [M.C.]'s claims." *Id.* at 10.

The Court further opined that the FAC did not allege that any of the proctors actually witnessed Harnad's grooming of M.C., pointing out that many of M.C.'s allegations of grooming (*e.g.* hypnotizing M.C. and having M.C. sit on his lap) took place out of public view in a classroom or Harnad's office, while the behavior occurring in plain sight consisted of "Harnad eating lunch with her, giving her marijuana on one occasion, and talking." *Id.* at 10-11. Because the allegations of grooming that occurred in plain sight were all non-sexual in nature, the Court concluded that the FAC's "allegations of grooming that occurred in plain sight and

the proctors' questioning, without more, fail[ed] to show that the Proctors had constructive or actual knowledge that Harnad was sexually abusing [M.C.]." *Id.*

In opposition to M.C.'s present motion, Princeton argues that M.C. did not sufficiently allege that it was foreseeable that Harnad would engage in off-campus sexual abuse, as M.C. "does not allege that any single particular act or instance was actually witnessed/known or could have been witnessed/known by [Princeton]" to put them on notice of the risk Harnad posed.  [Dkt. 63] at 12; *see also* [Dkt. 77] at 4.  In addition, Princeton emphasizes that the SAC does not allege that M.C., or anyone else, reported Harnad to Princeton until the commencement of this lawsuit, that anyone at Princeton knew of M.C.'s age, and notes that "all alleged public conduct by [Harnad] was not sexual in nature."  [Dkt. 63] at 12-13.  Princeton thus contends that "[M.C.]'s SAC fails to include sufficient details to meet the stringent standard of gross negligence, whereby [M.C.] must show [Princeton]'s actions constituted more than just inattention or misjudgment."  *Id.* at 13.

M.C., on the other hand, alleges that Harnad subjected her to "crimes of a sexual nature," including grooming and "psychological manipulations" on campus "openly" and "in plain sight."  [Dkt. 74] ¶¶ 92, 99-101, 116, 179, 186-187.  The undersigned first notes that the proposed SAC never explicitly alleges that any Princeton representative actually witnessed these open and notorious acts, and thus the pleading is deficient from the start.  Nonetheless, construing M.C.'s *pro se* pleading liberally, the undersigned interprets M.C.'s inclusion of these facts as an

intention to make such an argument.  The undersigned evaluates the allegations accordingly.

M.C. alleges that she was subject to a slew of dangers and grooming incidents that occurred on Princeton's campus, some of which she specifies were "in plain sight," including:  Harnad "picking up and dropping off children," including M.C., in his car "in plain sight;" Harnad "targeting, stalking, grooming, isolating and singling out" M.C.; Harnad eating at Princeton's cafeteria with M.C.; Harnad taking M.C. "in and out of offices and buildings" around Princeton; Harnad's utilization of a classroom to hypnotize M.C. and other minors; Harnad and M.C.'s "legs touching while sitting;" Harnad openly taking photos of M.C. and her friends; Harnad asking M.C. "to leave her friends and meet up to get alone time;" Harnad "assigning" a leg for each of the sisters to sit next to while he was sitting with groups of "townies;" and Harnad introducing M.C. "to another adult male on campus who also liked nymphets."  *Id.* at ¶¶ 99, 180, 187.  The SAC also alleges that M.C. had access to alcohol, marijuana, or other illicit drugs and became intoxicated on Princeton's campus, and that M.C. was questioned about her relationship with Harnad (though she does not specify by whom), to which she responded that Harnad was a "friend." *Id.* ¶ 99, 151.

M.C. ultimately asserts that Harnad openly developed "a known inappropriate pseudo-romantic relationship with [M.C.] on the campus premises, including, but not limited to, grounds, walkways, corridors, hallways, lawns, parking lots, campus cafeteria, offices and classrooms making the visible signs of

child sex abuse frequent patterns of increasingly suspicious criminal behavior." *Id.* ¶ 186.  M.C. alleges that Princeton's failure to ask her to leave the premises or otherwise take precautions despite the presence of this openly predatory behavior amounted to gross negligence.  *Id.* ¶¶ 70, 91, 133.

As an initial matter, M.C.'s allegations that the risk of harm was foreseeable based on acts alleged to have occurred in plain sight are substantially similar to the allegations made by N.S. in her complaint.  *See N.S.* R&R at 14-17.  Consequently, M.C.'s proposed SAC fails to cure the identified pleading deficiencies for the same reasons that N.S.'s proposed SAC failed to do so.  The undersigned incorporates the discussion of this issue in the *N.S.* R&R and only addresses the slight differences in the allegations of the two proposed SACs.  *Id.* at 17-20.

First, unlike N.S.'s proposed SAC—which was silent regarding how she, or anyone else, responded to questions about her relationship with Harnad—M.C. concedes that she indicated Harnad was a "friend" when asked about the nature of her relationship with him.  [Dkt. 74] ¶ 151.  Thus, while questions surrounding M.C.'s relationship with Harnad are not inconsistent with an assertion that someone may have suspected an inappropriate relationship, the facts alleged are still not sufficient to plausibly infer that a Princeton affiliate did suspect one, or should have.  *N.S.* R&R at 17-20.

Additionally, M.C.'s SAC contains significantly fewer alleged instances of grooming behavior that occurred *in plain sight* as compared to N.S.'s SAC.  Indeed, while M.C. alleges a laundry list of general alleged dangers and grooming incidents

that occurred on- and off-campus, the only actions alleged to have occurred openly or in plain sight were "Harnad . . . picking up and dropping off children[,] including [M.C.], in his gold Ford Maverick automobile in the campus parking lot and on Nassau Street in front of Nassau Hall," "Harnad t[aking] photos of [M.C.] and her friends" on campus, and Harnad's regular "target[ing] and stalk[ing]" of M.C. on campus.  [Dkt. 74] ¶¶ 99, 180, 187.  As with the allegations in N.S.'s proposed SAC, these allegations provide no specifics with respect to what acts of alleged grooming behavior were actually witnessed or heard, by whom, and when, and cannot withstand a Rule 12(b)(6) challenge for the reasons discussed in more detail in the *N.S.* R&R.  *N.S.* R&R at 17-20.

But even assuming that some Princeton representative (proctor or otherwise) did observe any (or all) of the grooming behaviors alleged, the proposed SAC does not establish a plausible inference that Princeton, through its affiliates, had "particular knowledge or special reason to know" that precursory sexual grooming or future sexual assault was afoot.  *Id.* at 19 (quoting *Child M. v. Fennes*, 2016 WL 4473253, at *5 (N.J. Super. Ct. App. Div. Aug. 25, 2016)).  As thoroughly explained in the *N.S.* R&R, the grooming behaviors alleged here could easily "seem normal or even caring to outsiders," and Princeton's ignorance of the incidents do not rise to the level of gross negligence, which requires plaintiffs to plead "something more than 'inattention' or 'mistaken judgment.'"  *Id.* at 9, 18-19 (quoting *Moretz v. Trustees of Princeton*, No. 21-19822 (GC), 2023 WL 9017155, at *5 (D.N.J. Dec. 29, 2023).

Accordingly, the SAC, like the FAC, does not sufficiently plead plausible facts to permit an inference that Princeton had either actual or constructive knowledge that Harnad was either grooming or sexually assaulting N.S. based on the asserted grooming acts that occurred "in plain sight."

### 2. The Risk of Harm to M.C. Was Not Foreseeable to Princeton Based on Incidents of Crime on Princeton's Campus Before and After Its Adoption of the Open Campus Policy.

In her FAC and opposition to the motion to dismiss it, M.C. alleged that several incidents of crime on Princeton's campus following its adoption of the Open Campus Policy—robberies, purse snatchings, and a stabbing—made the occurrence of sexual assault foreseeable to Princeton.  [Dkt. 27] at 3; [Dkt. 42] at 17-18.  In its June 27, 2024 opinion, the Court rejected M.C.'s argument that an "unrelated spree of criminal incidences—involving property crimes and other non-sexual violence—on Princeton's campus" established Princeton's constructive knowledge of sexual assault, emphasizing that the incidents cited to by M.C. "d[id] not make Harnad's criminal acts foreseeable."  [Dkt. 49] at 13.

Here, M.C. argues that the proposed SAC remedies the deficiencies that the Court previously identified because it provides sufficient facts to support the allegation that Princeton knew criminal activities occurred on its campus, and despite this, still invited minors onto the premises.  [Dkt. 62] at 3-4; [Dkt. 74] at 2. M.C. alleges that the additional articles the SAC cites to regarding crimes committed on Princeton's campus during the relevant time period, as well as documentation of discussions by Princeton students concerning sexual frustration,

16

sexual anxiety, and the like—which M.C. alleges are evidence of the fact that Princeton was a sexually hostile environment—are sufficient to support an inference that Princeton owed M.C. a duty since the risk to minor children was foreseeable.  [Dkt. 74] ¶¶ 111-115, 118-122.  M.C, consequently, alleges that Princeton committed gross negligence by opening the campus to minor children knowing that it was an unsafe environment, contending that the Open Campus policy was reckless towards the safety of minor children.  *Id.*

Additionally, M.C. advances a "loaded gun" analogy—arguing that Princeton's "actions in fostering a hazardous environment and inviting vulnerable minors into it were tantamount to giving a loaded gun to a child."  *Id.* ¶¶ 3-4.  M.C. reasons that "[j]ust as the risk of firing a loaded gun is inherent in giving it to a child, the risk of abuse is inherent [in] exposing minors to an unsupervised environment rife with dangers and without proper safeguards."  *Id.* ¶ 4.  Because both scenarios "involve the creation of an unreasonable and obvious risk of harm," M.C. argues, the party who is responsible for giving the child the metaphorical gun, here Princeton, should bear liability.  *Id.*

In response, Princeton argues that while M.C.'s proposed SAC "includes numerous new, additional citations to purported incidents or allegations of conduct at a large University campus . . . none is remotely sufficient to show that any off-campus sexual abuse of an unaffiliated minor was foreseeable" because of prior similar offenses or acts, particularly where the acts of sexual assault are not alleged to have occurred while on-campus.  [Dkt. 77] at 2-4; *see also* [Dkt. 63] at 13-14.

17

Indeed, Princeton notes that M.C.'s "selectively chosen public materials" are not relevant to her claims and legal theories, as "[n]ot one of these purported incidents or allegations of conduct . . . pertain to foreseeability of sexual violence against a minor, whether the assault was on campus, off campus, or by an 'employee'—and none is alleged to have involved Defendant Harnad." *Id.* at 3.

As to M.C.'s claim that Princeton didn't take any precautions to prevent harm to minors who entered campus after enacting the Open Campus Policy, Princeton emphasizes that M.C. herself has admitted that Princeton "employed campus security and had proctors with some level of authority and responsibility." *Id.* at 5. And, with respect to M.C.'s "loaded gun analogy," Princeton argues that her claim is nothing more than a legal conclusion that "do[es] not find factual support in the [SAC]." *Id.* at 2-3. Consequently, Princeton argues that the SAC "does not include substantive additional allegations that pertain to or advance [M.C.]'s legal claims against [Princeton]." *Id.* at 3. Princeton therefore contends that the SAC fails to state a claim for gross negligence and amendment would be futile. *Id.* at 4-5.

Because the proposed SAC's allegations of foreseeability based on incidents of crime on Princeton's campus before and after its adoption of the Open Campus Policy are substantially similar to the allegations from N.S.'s proposed SAC, the undersigned incorporates the discussion of this issue in the *N.S.* R&R. *See N.S.* R&R at 20-26. The undersigned therefore only addresses the material differences between N.S.'s proposed SAC and M.C.'s proposed SAC with respect to this issue—

*i.e.*, M.C.'s citation to additional public materials regarding alleged risks on Princeton's campus and her introduction of a "loaded gun analogy" in an attempt to show that M.C.'s sexual abuse was foreseeable to Princeton.

With respect to the public materials that M.C. relies upon, a review of the proposed SAC reveals that M.C. adds several incidents of crime or accounts of drug and/or alcohol use and discussions of apparent sexual dangers that were reported in publicly available materials that were not included in her FAC, including: (1) a 2017 article discussing Princeton alumni's resistance to coeducation at the university; (2) *Daily Princetonian* newspaper articles from January 1965 about the sexual frustration of Princeton students; (3) a 1966 *Daily Princetonian* article regarding sexual anxiety on Princeton's campus and its potential repercussions; (4) two 1967 newspaper articles discussing drug-related arrests and a "dope ring" at Princeton; (5) a 1967 article about a student ring of illegal liquor salesman; (6) a publication from 1968 regarding proctor patrol and stakeouts in response to "townie" thefts on campus; (7) two 1968 *Daily Princetonian* articles about the legal issues surrounding statutory rape and the ratio of men to women on Princeton's campus; (8) a 1969 *Daily Princetonian* article that notes that "crimes against persons" had "almost quadrupled" on Princeton's campus that year; (9) a 1969 article about drug use on campus; (10) a *Daily Princetonian* article from 1970 discussing Princeton students' "hate for townies"; (11) a 1970 article noting that "all forms of drugs" were sold on the lawn of Nassau Hall on Princeton's campus; (12) a 1971 publication in which Princeton proctors are quoted as saying that they

are "not cops"; and (13) a 1971 editorial response published in the *Daily Princetonian* that alleges Princeton University had "bias and prejudice" towards "townies." [Dkt. 74] ¶¶ 37-59.

Like N.S., M.C. argues that these newly identified incidents support her allegation that Princeton should have foreseen that permitting M.C., a minor, on campus via the Open Campus policy would put her at risk of sexual assault by Harnad. While M.C. cites nine additional instances (items (1)-(3), (6)-(10), and (12)) of crime and/or colloquies of apparent sexual dangers on Princeton's campus predating the adoption of the Open Campus Policy, the incidents alleged are still not sufficient in number, frequency, or degree to support an inference that it was foreseeable to Princeton that M.C. was at risk of being groomed on campus and later sexually assaulted by Harnad off campus. *See N.S.* R&R at 25-26 (citing *Ivins v. Town Tavern*, 762 A.2d 232, 237 (N.J. Super. Ct. App. Div. 2000); *Jackson-Locklear v. William Patterson University*, Civ. No. 16-5449 (JMV), 2018 WL 1942521, at *4 (D.N.J. Apr. 24, 2018)).

Indeed, several of the publications involve reporting on student-"townie" tensions, the role of proctors, general sexual frustration and sexual anxiety afflicting college students, and gender dynamics and disparities on Princeton's campus, but none alleges that there had been prior instances of sexual violence against a minor to put Princeton on notice of a potential risk, whether the abuse occurred on campus, off campus, or by an employee. Moreover, M.C. still does not allege that any of these incidents involved Harnad, or that Princeton had ever

received any report that he had a propensity for sexual abuse during the relevant time period. *G.A.-H v. K.G.G.*, 210 A.3d 907, 917 (2019) (declining to impose a duty on co-worker of plaintiff's abuser where court determined that there was no reasonable basis to conclude that the defendant knew that the abuser was engaged in an illegal sexual relationship with a minor). And while some materials discuss sexual proclivities in the abstract, none evinces a concrete threat of sexual violence that reasonably should have put Princeton on notice of the potential risk of sexual abuse to M.C. specifically, or non-students more generally. *Peguero v. Tau Kappa Epsilon Local Chapter*, 106 A.3d 565, 565 (N.J. Super. Ct. App. Div. 2015) (no duty for defendant to protect plaintiff against the independent crime of a third party where "there was no previous pattern of criminal conduct . . . that would have or should have alerted the individual defendants" to the harm to plaintiff).

Nor do the incidents reflect escalation of the kind that occurred in *Clohesy v. Food Circus Supermarkets, Inc.*, 694 A.2d 1017 (N.J. 1997). M.C. reports fewer than 20 'incidents' (compared to the 60 criminal incidents in *Clohesy*), only some of which involved actual conduct, and the article M.C. relies on to support the proposition that "crimes against persons" had "almost quadrupled" on the Princeton campus in 1969 focuses on muggings specifically, not an array of crimes like what occurred in *Clohesy*. *Id.* at 1021; [Dkt. 74] ¶¶ 37-59; [Dkt. 74-8].

Largely for the same reasons, M.C.'s "loaded gun" analogy is inapt. True enough, giving a loaded gun to a child poses an obvious and unreasonable risk of harm. Opening a university campus to the general public is something different

entirely:  For the reasons articulated above and in the *N.S.* R&R, the foreseeability of the risk that a minor would be sexually groomed and then abused by a university representative is not on the same plane as M.C.'s "loaded-gun" analogy.

Accordingly, for the reasons outlined above and in the *N.S.* R&R at pages 20-26, the proposed SAC does not cure the deficiencies identified in the Court's prior opinion, nor does it sufficiently plead facts to permit a plausible inference that prior criminal incidents made it foreseeable to Princeton that M.C. was at risk of being groomed and sexually assaulted by Harnad.

### 3. The Relationship of the Parties, the Nature of the Risk, Princeton's Opportunity and Ability to Exercise Reasonable Care, and Public Policy Considerations Weigh Against Imposing a Duty on Princeton Here.

In addition to M.C.'s failure to plead sufficiently that the risk of harm to her was foreseeable to Princeton, the undersigned also concludes that the other factors that New Jersey courts consider in assessing whether a duty exists—the relationship of the parties, the nature of the risk, Princeton's opportunity and ability to exercise reasonable care, and public policy considerations—also weigh against imposing a duty on Princeton here.  There is no doubt that the grooming and sexual assault of a minor is abhorrent and morally reprehensible, and that there exists a paramount public policy interest in preventing it.  But that interest alone does not justify recognizing a duty on Princeton in this particular factual scenario.

In the *N.S.* R&R, which addresses nearly identical facts as the ones alleged here, the undersigned concluded after balancing those factors that it would be

inappropriate to impose a duty on Princeton. *N.S.* R&R at 26-31. The same analysis is applicable here. However, M.C., unlike N.S., also alleges that imposing a duty in this case would be consistent with other statutes and legal principles generally relevant to the foreseeability inquiry, and that dismissing her claims against Princeton at this stage "would frustrate the legislative intent of the New Jersey revival statute." *See* [Dkt. 73] ¶ 12; [Dkt. 74] ¶¶ 7-14 (citing *Palsgraf v. Long Island Railroad*, 248 N.Y. 339 (1928); 42 U.S.C. § 1983; 18 U.S.C. § 2255; Title IX of the Education Amendments of 1972; the Restatement of Torts; and provisions of the N.J.S.A. applicable to public state colleges or corporations and nonprofits. *Id.* ¶¶ 5-11, 14-15, 29-31; [Dkt. 78] at 2. The undersigned disagrees.

While some of the principles that these legal sources embody are relevant to the issue of foreseeability as a general matter, none directly addresses the particular facts alleged in this case. So these abstract principles, in and of themselves, do not necessarily impose a duty in every case. Moreover, that the legislature's purpose in creating a two-year revival window for claims of sexual abuse was to enable victims unable to bring their claims earlier to seek justice does not establish a duty where one did not exist before. M.C. does not allege any other facts not already pled in N.S.'s proposed SAC to support the argument that the relationship of the parties, the nature of the risk, Princeton's opportunity and ability to exercise reasonable care, or public policy considerations support imposing a duty on Princeton here. On a review of all factors in the aggregate, then, imposing a duty on Princeton here is not warranted for the reasons discussed in

more detail in the *N.S.* R&R, which the undersigned adopts in full here. *N.S.* R&R at 26-31.

Accordingly, the undersigned concludes that imposing a duty on Princeton is unwarranted.

***

The proposed SAC does not plead sufficient facts leading to a plausible inference that Princeton owed M.C. a duty of care. As such, the undersigned recommends that the motion to amend be denied as to Count Two because M.C.'s claim of gross negligence is futile.

### C.    Negligent Infliction of Emotional Distress (Count Three)

Count Three of the proposed SAC alleges an amended claim of negligent infliction of emotional distress ("NIED") against Princeton. [Dkt. 74] ¶¶ 130-171. Just as the allegations made in N.S.'s proposed SAC were not sufficient to plausibly state a claim for NIED, M.C.'s claim remains futile. The undersigned thus incorporates the discussion of NIED from the *N.S.* R&R in full and discusses below only the material differences from N.S.'s proposed SAC. *See N.S.* R&R at 39-41.

Here, M.C.'s proposed SAC alleges that Princeton had a duty to take precautions against the "chaotic," "dangerous," and "sexually hostile" environment on Princeton's "predominantly male campus" that posed a foreseeable risk of harm "to any unsupervised girl," including M.C., and to generally "protect the safety and well-being" of "the unsupervised town children, including [M.C.]" after "invit[ing] and induc[ing]" them to gather on Princeton's campus "at all hours, despite the

known presence of drugs and criminal activity on campus." [Dkt. 74] at ¶¶ 132-134, 137-138, 165-166, 168-169. M.C. further asserts that but for Princeton's invitation to minors in June 1970, "she would not have been sexually targeted, groomed, and subjected to crimes of a sexual nature," and that Princeton's "gross negligence and deliberate indifference to the clear and present dangers led to actual harm, including the endangerment of M.C.'s welfare, exposure to delinquent behavior, and . . . emotional distress within a sexually hostile environment." *Id.* at ¶¶ 157, 163-164, 170. In support of these claims, M.C. relies on the same myriad of materials cited to support her gross negligence claim. *Id.* at ¶¶ 29-31, 37-59, 64, 66.

In its June 27, 2024 opinion, the Court noted that M.C.'s claim for NIED was "based on the same argument and facts as [her] premises liability claims" and that it therefore failed as to Princeton "for the same reasons [M.C.]'s premises liability claims d[id]." [Dkt. 49] at 15-16. In opposition to M.C.'s present motion, Princeton argues that M.C.'s NIED claim again fails for the same reasons that her gross negligence claim does: M.C. "fail[ed] to allege plausible *facts* to support the SAC's bare conclusions that Harnad's alleged sexual misconduct was foreseeable to [Princeton]." [Dkt. 63] at 15 (emphasis in original); *see also* [Dkt. 77] at 4-5. Princeton further asserts that M.C.'s additional citations are not "sufficient to show that any off-campus sexual abuse of an unaffiliated minor was foreseeable, let alone whether it was foreseeable that [Harnad] would engage in such actions," and

emphasizes that M.C. still does not allege that "Harnad engaged in sexual assault while on-campus." [Dkt. 77] at 4; *see also id*.

Indeed, M.C.'s allegations are the same as those on which she relies in her gross negligence claim—that Princeton's alleged failure to "address and rectify" the "sexually hostile environment" on Princeton's "predominantly male campus" or take precautions against illicit drug use and criminal activities made it foreseeable that M.C. would be sexually abused by Harnad. [Dkt. 74] at ¶¶ 133-134, 137-138, 169. The claim for NIED in the proposed SAC thus fails for the same reasons articulated in Section III.B. above, in the Court's earlier opinion, [Dkt. 49] at 15-16, and discussed in detail in the *N.S.* R&R at 39-41.

Accordingly, the undersigned recommends that the motion to amend be denied as to Count Three.

## IV.    CONCLUSION

For the reasons set forth above and in the Report and Recommendation issued in *N.S. v. Harnad*, *et al.*, Civ. No. 21-19820, [Dkt. 62], the undersigned recommends that M.C.'s motion for leave to file a second amended complaint, [Dkts. 62, 74], be denied as futile; that M.C.'s Motion to Update and Correct Case Caption for All Court Records and Reinstate Defendant "The Trustees of Princeton University," [Dkt. 68], be denied as moot; and that the case against Princeton now be closed with prejudice.

26

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Civil Rule 72.1(c)(2), the parties are advised that they have fourteen days to file and serve objections to this Report and Recommendation.

Date:  March 19, 2025

_____
J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE